We'll now move to Appeal 24-1942, John Kluge v. Brownsburg Community School Corporation. We'll begin with argument from the appellant, Mr. Cortman. Good morning, Your Honors. My name is David Cortman. I represent the plaintiff appellant, Mr. Kluge. May it please the Court. Mr. Kluge served as an outstanding orchestra teacher for several years until Brownsburg forced him to violate his religious beliefs by speaking a message that he objected to. This is a critical fact, as Mr. Kluge simply asked not to be forced to speak, but rather to remain silent on this controversial issue. But Brownsburg's first response to Mr. Kluge raising his religious objection was to suspend him pending termination. That was the beginning of the Title VII violation. That was not, forgive me, but that was not, as I recall, the first response. The first response was to give him the two accommodations that he requested. Actually, Your Honor, the very first response on the first day of school, when he voiced his objection, was to suspend him pending termination. When Mr. Kluge returned on that following Monday to sign the paperwork that gave him the option of complying with the policy or resigning or being terminated, that's when Mr. Kluge came up with the accommodation of using the last names. Right. After he had discussed it with his pastor, yes. Yes. All right. I won't argue with you. And the reason I bring that up, Your Honor, is Mr. Kluge had no obligation to raise an accommodation in the first place. That was the obligation under Title VII and under Roth of the school district itself. So if he hadn't mentioned that accommodation of using last names, he would have been terminated on the second day of school on that Monday. The form that they gave him said either sign this, comply, or you're terminated. So it's interesting to say that because he suggested a last name accommodation, which, by the way, was just one of the other names in the PowerSchool database, it was their actual last name, for him to be able to be terminated because he suggested using that last name doesn't alleviate the school district of their burden to come up with an alternative accommodation. And I want to talk about Roth because it specifically talks about that. Roth says that the school can't just consider a particular accommodation, such as a last name accommodation in this case, and determine it to be an undue hardship without considering alternative accommodations. In fact, Roth said it was necessary. In this case, the school has not proven that it raised any alternative accommodation. Did your client offer any? I know you're saying that it's the school's burden to do so, but did your client offer any alternative? Other than the last name accommodation, my client did not. But interesting, it is not his burden to do so. What should have happened in this case at the very beginning was the school district should have said, look, we have an issue here. We've passed this policy. We know you have a religious objection. Let's discuss some sort of accommodation that will work for both parties. If you look at the record, in fact, all five meetings between Mr. Klug and the school district, it was the same conversation. Either comply, resign, or be fired. There was no discussion by the school district at all. Let me ask a question, Mr. Corbett. We've got a new standard. Roth's come down. It's articulated it with regard to the entity's mission. How should we go about evaluating whether an entity's definition of its business is legitimate? I think the way to look at it under Roth is, you've got to look at the new standard for the undue hardship. Last time we were here, it was de minimis. The court called it trifling. Now we're looking at substantial, excessive, unjustifiable. In the context of the entire operation of the school. So there's two points to that question, Your Honor. The first thing is, I think the school can define a legitimate mission, but it can't define it in such a particular way to violate Mr. Klug's rights. So, for example, it can say, well, we have a particular mission here, and the reason it gave for this policy was to affirm students' gender identity. It can certainly do so if it wishes to, but it can't define that mission to then say, and Mr. Klug, by the way, you have to affirm their gender identity and violate your religious beliefs. Well, we're talking about a level of generality, right? So you've got the Indiana Constitution and laws, which are very general. Then you've got a mission statement from the school that could be read to be particular to this one teacher. We're looking for somewhere in between. How do we evaluate where that standard should be set? I think the line is set whenever it, and I think this case is easy on that line because if it sets it to violating someone's rights in your mission, I think that clearly crosses the line. What about the mission of educating all students by being a welcome and inclusive place? Sure, and I think that's permissible until you define it as the way you welcome students is by affirming their gender identity. So certainly Mr. Klug was welcoming. Everybody loved him. He's a great teacher. Orchestra performed well. The only issue here was whether the school had a right to obligate Mr. Klug to violate his religious beliefs by using this preferred name or preferred pronoun. What should have happened is the school should have gotten the parties together and said, okay, what kind of agreement, what kind of compromise can we come to? Let's have a conversation. In the school context and looking at this new standard under Graf, can the emotional harm to students be a substantial burden on the school? There's a possibility it could. Not in this particular case because I don't want to cover every case or possibility that could be out there. But if you look at these particular facts, Your Honor raises a good point because the only evidence in the record is that the students were offended because Mr. Klug would not use their insisted preferred name or preferred pronoun. And so that's all the offense was. That's all we have in the record. That certainly is not enough to rise to the excessive unjustifiable burden. So what would distinguish mere offense from a substantial burden being emotional harm on students? Because I think you would agree schools, especially high schools, grade schools, part of the mission is to make sure that students feel welcome and they're inclusive. So there's a little bit of a tug there. And I think there may be theoretically. I don't think there is here. And I think we have to look at what can we allow students to insist on. These are weighty issues. So are politics. So are religious issues. And we can't just say, look, to the students, we're going to allow you to insist on whatever you want and we'll make sure you get that. If the policy was defined the right way at the beginning, and I want to talk about the policy because I think this may help to answer your question. The school basically said we want to make sure that everyone is affirming gender identity. In the transgender question policy, the school has three carve outs itself. And this matters to both your honors question and the undue hardship. The school says there's instances where we're not going to affirm your gender identity. So, for example, overnight trips are done by biological sex, not gender identity. Use of locker rooms and showers are done by biological sex and not gender identity. And so is a sub database that the school has. So if the school says, look, there are instances where we can't affirm your gender identity, and they carve out exceptions, which then undermines the undue hardship, then they should have carved out one for Mr. Klug. And so the way they set up that policy was the issue in the first place. And back to your honors question, the offense can't be students insist on whatever they want and the school has to capitulate. An example is I was trying to think through what would be something similar to talk about. What if there is an atheist teacher in comparative religion class? And the student says, and they say, well, you have to affirm God because you're in comparative religion and it will offend the student and the students sincerely have religious belief. The school couldn't do that. Flip the hypo. What if there's a religious teacher and he's teaching in a class of science and the school says, well, the science proves there's no God, and the students will be upset if you're a Christian or Muslim or whatever religion you are, and you say there is a God. Can they force him to say there is no God? There's a limit to where you can say, well, we want to make sure the students are happy, and so we'll force you, we'll compel your speech to violate your faith. Mr. Kortman, I want to go back to this. Does it really matter to the gross substantial cost inquiry that only a few transgender students may have been directly impacted, directly impacted because others were obviously impacted by the accommodation? Doesn't the school district have a duty to each and every student to provide a supportive learning environment, even if only two students say they were injured by the accommodation? Why would the district be free to ignore that as a cost? You know, if we were talking about the school district's obligation to a student with a disability or a student who is in a religious or racial minority, we wouldn't be saying, well, you know, it's just one or two students. I am having a tremendous problem with that. Yes, and Your Honor, I don't think we ignore the two students, but I do think Rob says you have to look at the overall context of the entire business. So I don't think we solely, I don't think we ignore them, but nor do we solely focus on that. There's a balance of how does this accommodation affect the entire operation of the school? It doesn't disrupt the entire operation. Look, exactly. In contrast to other cases, the employer in this case actually tried the accommodations, there were two, that the employee proposed. I'm talking about the uniforms as well, and gave it a chance to work. And it did not work in the sense that it caused emotional harm to transgender students. As Mr. Klug himself has recognized, and it resulted in complaints and expressions of concern from students, teachers, counselors, parents. Why does that not all amount to a concrete showing of significant costs resulting from the accommodations? This isn't theoretical harm, it's actual harm. There's two responses to that, Your Honor. The first one is, Groff specifically says that Brownsburg cannot consider an undue hardship for a particular accommodation without looking for other accommodations. So I will grant the court's question, but it still requires more even if the complaints amounted to an undue hardship. For the first part of Your Honor's question, I think we have to look at all the students. And all my answer is, what we don't do is say the students get to decide whether a teacher can violate their rights. There's a compromise there. So go to the students and say, you're not happy with the last name? Can we come up with another accommodation? Is there something else we can do? The conversation has to be had even if it affects the students. Courtman, I hear you saying numerosity, how widespread is the problem that the hardship may or may not result in. Then I hear depth. What type of, how strong are the feelings that happen as a result of this? If you've got a wholesale change that exists that's going to affect the school, that's going to be different than one class. If you've got a very strong violation of a circumstance versus something that's more tangential. Are those the types of metrics we're to look at?  And that's what Groff requires because it looks at both what is the harm. And Groff specifically talked about complaints that are off the table. And I don't want to minimize the effect here and the offense of the students. But Groff says if you're objecting to the religious exercise or the religious speech or the notion of the accommodation itself, it's off the table. That's exactly what the objection was. Because Mr. Kluge was saying, look, I can't speak this message. I just want to stay silent. And the school said, no, you have to speak. You say, let's find a way where I don't have to address this controversial issue. That's the way it should have been handled for both the students and for Mr. Kluge. If I may, I see my time's running down. I'd like to save the remaining time. Can I ask you one more question, please? May I? Yes. You know, it seems to me as it did, you know, to Judge Magnus Sensen that the school district has a right to own, to define and its own mission. And Mr. Kluge may disagree with the way in which the school district has articulated that mission. In other school districts, other employers might really choose to accept the mission of St. Brown's, you know, to define their own missions. Let's put it that way. But why are we not required to accept the mission as the Brownsburg school district has defined it as we assess whether the accommodation to Mr. Kluge resulted in undue hardship? Because the mission can't be defined in the way that violates Mr. Kluge's rights. He has protections under Title VII where we're required to make sure that religious people don't have to sacrifice their job and to violate their faith. And I think that's the short answer. And OK, then help me with this one, because this has really bothered me. I want to ask you a question about religious sincerity. Can we not accept, as I certainly do, I really do, the sincerity of Mr. Kluge's religious beliefs with respect to transgender individuals, and yet still consider Mr. Kluge's voluntary use of the first names that the children have requested be used at an award ceremony? Why isn't it relevant as to whether there was a genuine need for the last names only in the classroom? If he could use the transgender corrected names in a very, very public award ceremony with all the teachers and the parents and the community, why not in the classroom? I mean, and isn't that, well, all right, I'll leave it at that. No, Your Honor, because what the court has said is that you have to look at whether the sincerity is a sham. It clearly isn't a sham. Also, the court says we can't question where Mr. Kluge draws the line. He specifically said what violated his religious beliefs was promoting gender dysphoria on a daily basis using the preferred name and the pronoun every single day. It's okay on the days when there are award ceremonies, when the entire community is there. That's okay. It is according to his religious beliefs, which is what matters. He explained that by saying that what religion, what religion allows you to parse out one, an exception for huge crowds, but not in the classroom where the children are surrounded by their peers. Your Honor, this court in IDI and the Supreme Court in Thomas says we don't question where the believer draws the line. It doesn't have to be consistent with his faith or his church, but it is. He explained that because he was acting like a coach in a formal ceremony, even a coach wouldn't use a last name. He basically said under that individual circumstance, because of the sincerity of the program, that he would use that name in one instance, which is a completely different story from every single day using a preferred name and a preferred pronoun. Why wouldn't that be a credibility issue at a minimum? I understand we can't question where he draws the line, but why wouldn't that create an issue of fact based on his credibility? Because the reason that it's – I don't think we can go there. The facts clearly show that for someone to give up a job they love, their livelihood, after all the pressure and everything that was put on him, this wasn't just a belief that kind of came and went. He basically said from the very beginning for the entire year, even though – He can certainly argue that, but there are these other factors. How can we rule as a matter of law either way that there was sincerity or there wasn't given these other factors that question the credibility of it? If you line up all of the facts, you have dozens of facts on one side that he has sincerely held religious belief. He gave up his career. He explained what the difference was. The court says we don't question his beliefs. Inconsistency doesn't matter. Backsliding doesn't matter. All those things matter. And all we have on the other side of the scale is one ceremony that Mr. Kluge explained that the reason he did it was because he didn't think it was violating his beliefs. And since we can't decide where that line is, only he can, that one fact is not enough to override – We also have some evidence that some students said during the class he would slip and call by the first name. So I think we have a little bit more evidence. Well, I don't think that counts for two reasons. Number one, the policy says slip-ups are okay. It's going to happen. And when you're calling someone by a name and a pronoun for years, you do slip up. It's just a natural part of it. So that fact doesn't go to his religious beliefs. That fact just goes to common communication of something you're used to and then all of a sudden trying to stop and change that. Can I ask one optional question? I want to switch and ask – I know your time is over, but I want to ask one more question. I want to switch to the retaliation claim. So we asked for briefing when the petition for rehearing and en banc was filed. Groff came down after our initial decision. And we asked for both parties to submit supplemental briefing on the impact of Groff on this case. And you said as to the retaliation claim that Groff does not speak to Mr. Kluge's retaliation claim. Given that statement in your supplemental brief, why haven't you waived your right to proceed with the retaliation claim? I'm not familiar with the exact sentence. I just read it. I was quoting. The reason is that what Groff ruled upon completely undercut the retaliation decision by the district court. And let me explain. That's not what you said in your supplemental briefing. That's my point. You said something – you said Groff didn't impact the retaliation claim. Again, Your Honor, I will look at it. But the reason – and if we did, we did. But I just want to say that the complaints that was used as the justification for the retaliation claim as a legitimate, non-discriminatory reason was then taken off the table by Groff. And so once that's done, then the school no longer carried its burden of proof. Right. I understand the substantive argument. Mine was more a waiver question up front. I will look at it. I do not know. We'll be granting you a little bit of rebuttal time. Thank you, Your Honor. So thank you. Thank you, Mr. Cortman. Mr. Borg, we'll move to you for argument on behalf of the appellee. Thank you, Your Honor. Good morning, and may it please the Court. Brent Borg for the appellee, Brownsburg Community School Corporation. Your Honor, I want to start with the first basis that the district court found that supported undue hardship, and that has to do with the substantial student harm presented in this case, as well as the interference with Brownsburg's mission. There was some good discussion about how does this court go about that analysis, and Judge Brennan, you said something that I think is pretty helpful, is that in analyzing the mission, there is a level of generalities, and when you do start with the constitutional requirement that Brownsburg as a public school corporation has to be open to all students within its district, but then you get down from that 50,000-foot view, if you will, to a lower level, and at an administrator or maybe a school corporation level, Brownsburg says, well, how do we make education for our students open to all? I appreciate you framing that. Let me follow up on that. If the mission is affording dignity and empathy towards transgender students, was that ever documented anywhere before this litigation? I believe that was, and that's first and foremost in the outreach efforts that the administration undertook prior to the 2017-2018 school year at the high school. Bear in mind that this was new to everybody at the high school. There were transgender students at the middle school, but they were graduating, if you will, and they were going to become freshmen. So it was on the mind of administrators, and like educators, they took the position of we need to start educating our teachers on this. But if the mission is going to be defined that narrowly and specifically, and those words that become the mission or the policy come out during this litigation, it's hard. It seems like it's post hoc that individuals have to rush to catch up with what the mission is if the mission is particular just to them. Well, and I think I'm going to get to that, but I have a disagreement with counsel's characterization of what the mission is and maybe what you're getting at is when we get down to more levels of specificity, maybe the lower level or the mid-level, if you will, is a safe and inclusive environment that everybody's mentioned, but it is affirmation. That's probably not even the best word, affirmation towards transgender students. It is more in the sense that it is on par with all other students. In other words, call me by my first name, a very basic, a very common thing that I think a lot of people just simply take for granted and goes to your identity. Why first name and not last name? Why wouldn't calling everyone by the last name be the same? I think it is at the start, and that's how the school started with its accommodation, and they said let's give it a try. I think that is in the spirit of what Groff requires and what reasonable accommodation requires is we don't quite know the answer here. Having transgender students is new to us and it's new to everybody, and what you've requested seems reasonable, and the record bears out that the school allowed that accommodation to continue and it allowed the accommodation to continue despite the fact that complaints were starting to percolate up within the high school community. I appreciate, again, you bringing that to the point because if Groff is telling us that the entity, the school, has to show that the accommodation unduly affected the education of students by disrupting the learning environment, there's a number of ways to look at that. How many students? Who is being disrupted? How are they being disrupted? All of the foundational questions that one would normally ask in a trial circumstance or discovery of circumstance. Here we've got this set of facts. We've got a couple students. We have the counselor. We've got a parent. But we don't really know how broad this effect was during that year or how deep the effect was. It's almost as if people are automatically saying if someone is hurt or if someone's feelings are hurt, that therefore that's enough to undermine the accommodation. Your response? With respect, I don't think that's what the evidence shows, and I don't think that's what Brownsburg was looking at. I do understand your point that you can extrapolate in almost any situation, and Brownsburg is a relatively large school corporation. But within the Performing Arts Department, you're not talking about a tremendous amount of students. I think the record shows that Mr. Klug had maybe 40 students in a particular class, and you have three or four transgender students, and you also have non-transgender students who are indicating that there's a disruption here. Did they ever use the word disruption, though? I think even the one parent, Daghe, D-A-G-H-E, didn't even use the word disrupt. There was talk about some students didn't know why the last names were being used. Some did. The record itself is not, and I understand there's going to be advocacy on both sides, but the record itself is not as clear, I think, as maybe is being presented. So disruption can take a lot of forms, right, Your Honor? But I think disruptions here in the sense of some of the affidavit testimony from the transgender students, I dreaded going to class each day. I eventually decided to withdraw. I made up my mind that I was going to withdraw from the class. So it is disruption in that sense. Is it maybe disruption in the sense that, you know, the school, the entire class could not focus, could not attend to the lesson of the day? I grant that it's not that sort of disruption. How does the evidence in the record that the students were performing better, doing better on exams, how does that weigh into this balance of substantial burden? It doesn't, Your Honor, and it goes back to the mission analysis. And Mr. Klug, from the outset, used a sports analogy, and I think a sports analogy is good in this instance. I think it would be reasonable for a sports program to define success by the MVPs and by the All-Stars that it has, but Brownsburg did not do it that way. But if your mission is to educate all students, and there's evidence showing that in orchestra and in music that they were doing better in terms of their education, why wouldn't that be a piece of the substantial burden analysis? Because Brownsburg decides based on its mission that it has to look at it holistically. It judges success by the success of the team as a whole. And assume that's true, why isn't that one piece of the holistic puzzle? I think it is, and I think Brownsburg administrators would say yes, we take that as a given. It is great that we have students over here excelling and that they enjoy the experience. But we can't forget the folks over here. We know that just mere offense to a different viewpoint isn't sufficient for a substantial burden. How do you balance or where's the line between emotional harm to students rising to a substantial burden versus merely students taking an offense at a different viewpoint? Sure. I think part of the analysis, and again, what principle to gain, what the administration did, bore this out. He did not rush to judgment. He said this situation might even resolve itself, and that was when he was receiving information from Craig Lee, who's sitting in on these Equality Alliance meetings on a weekly basis, and saying let's just see where it bears out, and then it starts to percolate up. And I think as the district court found, it's very important to note in this case that the evidence of the student harm and the emotional harm, as opposed to mere offense, is undisputed. So I think that investigation process. I'm not sure that the Plaintiff's Counsel would agree with that. I'm not sure Mr. Cortman would agree that the evidence of emotional harm to the students is undisputed. We can ask him, but I'm not sure he'd agree with that. Well, and I want to get to the root of your question, Honor. I think principle to gain's effort to bear this out is that he started conducting inquiries, and I think that's sort of a sorting process to determine, are we dealing with students who are merely offended by the conduct, or are we dealing with students who are saying, you know, this is dehumanizing me. I'm dreading going to class. And he's hearing that from an Equality Alliance teacher who's a sponsor for the club. He's hearing that from the co-chairs of the Performing Arts Club. Would it be an undue burden if one student said that and nobody else? Yes. If there's emotional harm to one student, that would be an undue burden. Yes, that could rise to that level. Obviously there's a continuum there, and Gras says you need to consider the size and the nature and everything else. But certainly that could be the case when you consider mission. Another thing that I think hasn't been brought up today, but I think it's important to mention, is this is not the student's personal preference. This is the student backed by a health care professional and backed by the parents saying it is in the best interest of my child. As the district court I think noted, the school, again, when you go back prior to the 2017-2018 school year, it was sort of a search process. This was new to the high school, and as the district court noted, they reasonably deferred to the judgment of the health care provider and to parents. They weren't just going to allow a student to come in and say, hey, call me this name and accept that at face value. Mr. Borg, you began with the two reasons that the district court relied upon, the mission and whether or not the undue hardship, there was a problem with that. And secondly, the Title IX liability. The cases, though, that are cited that would potentially put the school district at risk for Title IX liability, those are ones in which the transgender student was treated differently than other students. Isn't it the case here that the students were all being treated the same by Mr. Kluge? For purpose of our summary judgment, yes, they were. I think we need to make that assumption. But I think the Whitaker case is in alignment with it, Your Honor. Whitaker was decided just several months before, I believe, the start of the 2017-2018 school year. You have instances in the record where there is mentioning of a recent court case that has changed the law in this area. And as I understand Whitaker, I think it is recognizing that the argument of a gender-neutral bathroom was rejected because the court, and I'm paraphrasing here a little bit, said that is the policy itself, and a gender-neutral argument is not going to get past the court's grant of a preliminary injunction. Here as well, if Mr. Kluge, or if Brownsburg, rather, allows the last name only accommodation to continue, it is, in light of all the harms that have been demonstrated by this record, in light of all the concerns that are raised by the teachers and by the other stakeholders in the high school community, it is condoning Mr. Kluge's neutrality when the underlying reason that he's doing that is on the basis of a student's transgender status. And isn't it, or is it so, well, no, isn't it so, that Mr. Kluge admitted that he caused emotional harm and was pleased because his practice was effective as to the students? I think you can read it that way, and maybe to take a step back from that, Your Honor, Mr. Kluge conceded in his deposition that a school corporation has an interest in the emotional well-being of its students. And certainly from Principal DeGay's perspective, that's the conversation you're referencing, that's the second part of that, again, he's taking a slow approach to this. He's taking a patient approach, and when the complaints start to percolate up or reach a critical mass, he doesn't make a rash decision. He doesn't just say, no more accommodation. He goes to the object of those complaints, namely Mr. Kluge, and he says, you know, John, we have a problem here. And he's putting this information at his feet, and Judge Rovner, to your point, his response is, there's no problem at all. I'm going to continue what I'm doing. And that's not in the nature of the type of discussion that reasonable accommodation requires. I know there was earlier conversation with counsel of Groff's requirement that the employer can't just provide one accommodation and then throw in the towel, so to speak. We accept that, but the evidence is undisputed in this instance that no other accommodation was available with regard to last names. Mr. Kluge was the only orchestra teacher at the high school. He was the only person who taught the music theory classes, so there was nothing else that was proposed or nothing else that could be done, and that's been undisputed throughout. For example, they did on the uniforms. They had someone else give out the uniforms, right? The band uniforms. Yes, that's correct. And that accommodation never changed. To follow up on the mission, the Title IX question, the very fact that this case has been so litigated in such a manner shows that the potential liability was not clear to the school district, right? I mean, we've got huge disputes over the facts. We've got disputes over the law. The legal standard itself has been changed by the Supreme Court during the course of the litigation. This is not clear nose on face that the school district would be walking into a problem if it did what it did, right? I don't think that's, with respect, Your Honor, I don't know that that's correct. I think it should be enough for this court to say Title IX prohibits discrimination on the basis of sex. That's certainly been extended in a Title VII context to transgender status, and I don't think, you know... It certainly does protect transgender students against discrimination, but back to Judge Brennan's earlier point, the policy here was applied to everybody, so everybody was treated the same. How would that expose the school to discrimination against transgender students when they're treated identical to other students? I believe that's the same argument that this court rejected in Whitaker. Namely, a gender-neutral bathroom does not satisfy because the reason the school is providing the gender-neutral is that it's discrimination based on the transgender student's status. Here as well, the reason that Brownsburg is extending the accommodation is because Mr. Coog refuses to call transgender students by their first names. You can continue, because I'm going to give him some rebuttal time if there's a last couple minutes you'd like to cover. Just very briefly to address the retaliation claim, our position is that it's a very simple and straightforward analysis. This court defined the scope of its remand order, and it required the district court to address Groff under its clarified standard, as the district court noted, and gave very short thrift to the retaliation claim. Groff does not concern a Title VII retaliation claim at all. It concerns the undue hardship standard for reasonable religious accommodation under Title VII. This court, I suppose, could have the authority to interpret its order, and it could have the authority to revisit its order, but could is different than should. What about the fact that we vacated our entire opinion, including the retaliation aspect of the opinion? The evidence has not changed, Your Honor, and I think that... Well, if there is an issue of fact on whether or not it was a legitimate reason, the law has changed. The law has... So putting aside the merits and whether or not you should prevail on the retaliation claim, just in terms of the scope of the remand, while we did say in the remand we send it back to address the religious accommodation claim, we vacated our entire opinion. So what would be the procedural problem of addressing the retaliation claim in light of the fact that we vacated the entire opinion? The court could certainly do that, and if it were to do so, it should consider the prejudice to Brownsburg that it did not... It's effectively two bites at the apple for Mr. Kluge based on the happy stance of the Supreme Court and changing the standard that has nothing to do with Title VII retaliation. Mr. Borg, without getting into any attorney-client privileged communications, at one juncture when the case went back to Judge Magnus Stinson and the parties were engaging in discussions about the way the case would be handled on remand, there was an order that indicated that no further discovery was going to be taken. Was that based upon a discussion, again, without getting into any privileged communications, discussion among counsel, discussion with the court? Was it just kind of an assumption? Forgive me, my memory might be faulty, but I believe there was preliminary discussion among the parties' counsel, and neither side felt very strongly about reopening the record, and based on that lack of interest, it was mutually decided that we went to the court and said everyone's in agreement that we don't need to reopen the record. Thank you. I appreciate that. Brownsburg respectfully requests that this court affirm the district court in all respects. Thank you for your time today. Thank you, Mr. Borg. Mr. Cortman, we'll give you three minutes for rebuttal. If I could prevail upon you to answer that final question that I posed to Mr. Borg about reopening discovery. Yes, Your Honor. My recollection is the parties discussed it and decided that there was no need to reopen discovery, and I think the reason for that, at least in our opinion, I won't speak for the other side, is discovery was fully done and completed. There were document exchanges. There were depositions taken. There was no more facts that needed to be put into the record, and that's why our point here, in fact, this court and the court below ruled everything as a matter of law, and the reason is there's no outstanding facts that need to be discovered. The question is when you have all these facts, which both sides agree to, the only question is what's the legal interpretation of those facts, so we believe that more facts won't change anything even though the court changed standards. I want to point out just a couple of things in my time, if I may. The retaliation claim, real quickly, I read what Your Honor said. Groff does not speak to the retaliation claim. In and of itself, it's absolutely true. I would say, though, that it did affect the retaliation claim. We were talking in that section about the legal standard, so Your Honor is absolutely right, but it doesn't mean there was no impact that Groff had on the retaliation standard, and I think the complaint being taken off the table takes away the legitimate non-discriminatory reason, and so I think, and we've been briefing it both before and after for the last seven years, so there's obviously no prejudice when both sides have briefed that issue for the dozens of briefs here. I also wanted to talk to one point about the complaints. I know there are some differing opinions about it. What I want to emphasize is that regardless of the complaints, the school district had an obligation to consider alternative accommodations, and it never did. So even regardless of how the court feels about the complaints, what kind of offense, what kind of impact, what I would say is, is regardless of those, Groff says it's necessary, even if you find hardship on a particular accommodation, to explore other accommodations. The school has not carried its burden. In fact, the evidence shows there were no other accommodations for his speaking. Yes, there was an accommodation for the uniform, but one accommodation on one thing doesn't eliminate the need to accommodate his being forced to speak a message that he disagrees with. So that is still there where they didn't carry their burden to show. They explored alternative accommodations, even putting the complaints aside. The last thing I want to say, and I appreciate the extra time, Your Honors, is that Groff substantially changed what we're looking at here. There's a sea change from trifling or de minimis to excessive, unjustifiable in the overall context of the business, and I think if you apply Groff's standard here, then summary judgment should be granted to Mr. Kruge on both of his claims. If there are no further questions. Judge Rovner, any further questions? No, but thank you. Thank you, Mr. Kortman. Thank you. Thank you, Mr. Kortman. Thank you, Mr. Borg. The case will be taken under advisement.